[Crim. No. 39449. Second Dist., Div. One. June 30, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ALEXANDER TORRES, Defendant and Appellant.

COUNSEL

Robert J. Wade for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Roy C. Preminger and Timothy E. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HANSON (Thaxton), J.—Defendant William Alexander Torres appeals his conviction, pursuant to jury verdict in case No. 30568, of the sale of

marijuana and the sale and possession of concentrated cannabis (Health & Saf. Code, §§ 11357, subd. (a) and 11360, subd. (a)). Defendant Torres also appeals a second conviction, following a jury trial in case No. 32389, of selling marijuana (Health & Saf. Code, § 11360, subd. (a)); possession of marijuana for sale (Health & Saf. Code, § 11359); and possession of concentrated cannabis (Health & Saf. Code, § 11357, subd. (a)). The two cases have been consolidated on appeal.

## PROCEDURAL HISTORY

Case No. 30568 was instituted on March 14, 1980, when a five-count information was filed by the Santa Barbara District Attorney against defendant Torres. In counts I, II, III and IV, defendant was charged with selling marijuana and with selling concentrated cannabis (Health & Saf. Code, § 11360, subd. (a)); and in count V, defendant was charged with possession of concentrated cannabis (Health & Saf. Code, § 11357, subd. (a)).[1]

Following a preliminary hearing on March 24, 1980, defendant was arraigned, pled not guilty to all five counts, and was released on bail pending trial. Case No. 30568 proceeded to trial on October 30, 1980. Defendant's motion to conduct his defense in propria persona was granted by the trial court. Following a jury trial, defendant was convicted on all five counts.

A few days before case No. 30568 proceeded to trial, the Santa Barbara District Attorney, on October 27, 1980, filed a second information, case No. 32389, charging defendant with count I selling marijuana (Health & Saf. Code, § 11360, subd. (a)); count II possession of marijuana for sale (Health & Saf. Code, 11359);[2] and count III possession of concentrated cannabis (Health & Saf. Code, § 11357, subd. (a)).

Defendant was arraigned on October 28, 1980, and elected to proceed in propria persona. At this time, the prosecution moved to consolidate case No. 32389 with case No. 30568, on the basis that the charges

---

[1]Section 11357, subdivision (a) provides in pertinent part that "every person who possesses any concentrated cannabis shall be punished by imprisonment" for a period of not more than one year.

Section 11360, subdivision (a) provides in pertinent part that "every person who . . . furnishes, administers, or gives away . . . any marijuana shall be punished by imprisonment in the state prison" for a period of two, three, or four years.

[2]Section 11359 provides in pertinent part that "[e]very person who possesses for sale any marijuana . . . shall be punished by imprisonment in the state prison."

in both cases were factually very similar, and that "it would be a great savings of the court's time and defendant's time if these matters were tried together." The trial court denied the prosecution's motion for consolidation.[3] In case No. 32389, defendant was found guilty pursuant to jury verdict on all three counts.

On December 4, 1980, defendant was sentenced in both cases. The trial court denied defendant probation and sentenced him to three years in the state prison. Defendant filed notice of appeal from both judgments on December 24, 1980.

### FACTS

In case No. 30568, witnesses for the prosecution testified as follows:

Prosecution witness Richard Gibson testified that for a period of time in 1980, Gibson was cooperating with the Santa Barbara County Sheriff's Department in the investigation of drug traffic in the Santa Maria Valley; that prior to his cooperating with the sheriff's department he had been arrested for cultivating marijuana; and that in return for having the cultivation charges against him reduced to a lesser offense, Gibson agreed to work for the sheriff's department.

Gibson further testified that on February 18, 1980, he went to defendant's residence in Los Alamos at the direction of the sheriff's department;[4] that he was admitted by defendant; that once inside, Gibson noticed several persons smoking marijuana; that Gibson told defendant he heard some "weed" could be obtained at defendant's residence; that defendant informed Gibson that he could not sell marijuana, but that Gibson could have some for a "donation" to the church; that defendant did not have any marijuana to give Gibson at that time; that before Gibson left, a marijuana cigarette was passed around and Gibson smoked it; that on February 27, March 2, and March 5 of 1980 Gibson returned to defendant's residence at the direc-

---

[3]At the time of the arraignment proceeding in case No. 32389, defendant had not yet elected to proceed in propria persona in case No. 30568. The record indicates that the trial court apparently felt a consolidation of the cases would have conflicted with defendant's choice to be represented by counsel in case No. 30568, while simultaneously proceeding in propria persona in case No. 32389.

[4]Deputy Carroll of the Santa Barbara Sheriff's Department testified that prior to sending Mr. Gibson to defendant's house, Carroll had received a number of citizens' complaints about defendant's activities in Los Alamos. Carroll testified that these complaints alleged that persons in the area of defendant's residence openly smoked marijuana, played loud music, and urinated in the street.

tion of the sheriff's department, and there he purchased from defendant several ounces of marijuana; and that on March 12, 1980, Gibson again returned to defendant's home at the direction of sheriff's deputies and he purchased an eighth of an ounce of hashish.

Deputy Sheriff Legault of the sheriff's department testified that on March 13, 1980, he served on defendant a warrant authorizing a search of defendant's residence; that Legault found hashish in a room in defendant's residence marked "Ministry Office," and marijuana plants inside a locked room marked "Ministry Only;" that Sheriff Legault believed that the narcotics belonged to defendant since the building was listed in defendant's name, all the paperwork inside the ministry office was in defendant's name; that defendant was sleeping there in a room when the officers arrived; and that the items seized pursuant to the search warrant were sent to the California Department of Justice Laboratory.[5]

Defense witnesses testified, in substance, that on July 4, 1979, defendant and 28 others founded the New Genesis Congregation of the Universal Life Church; that at the time of trial, the total congregation was approximately 1,500 members;[6] that in order to become a minister of the church, and thus be able to partake of its sacrament, one had to fill out a card; that at the time the church was founded, marijuana was designated as a sacrament of the church, but was not an object of worship; that members of the church were not required to smoke marijuana or participate in the church's sacraments; that marijuana was not an indispensable part of the church; and that in return for contributions to the church, some members received marijuana.

Defendant testified in substance that the church bought marijuana and the members smoked it because it made them feel good, at ease, and peaceful; that defendant felt no obligation to adhere to arbitrary laws which were contrary to reason; and that defendant felt the laws making it a crime to sell marijuana were arbitrary laws. Defendant also testified that his residence in Los Alamos was a "church."

In case No. 32389, Deputy Reuben Olivas testified for the prosecution stating that he was a member of the sheriff's department narcotics task force; that on September 26, 1980, Olivas posed as a hitchhiker

[5]Lawrence Joiner, a criminalist at the state laboratory, testified that the items of evidence obtained from Gibson and from the March 13, 1980, search were tested and positively identified as hashish and marijuana.

[6]The record indicates that among the church's members were the court bailiff and several officers of the Santa Barbara Sheriff's Department.

and went to defendant's residence with the purpose of attempting to purchase marijuana; that Olivas was carrying a transmitting device taped to his chest, the receiver for which was in a patrol car occupied by two other officers.

Olivas further testified that he arrived at defendant's house at about 11:30 p.m., and was admitted by defendant; that Olivas asked defendant if he had any marijuana, and that defendant stated he had greenleaf marijuana, sinsemilla marijuana, and hashish; that Olivas gave defendant $15 for a half-ounce of greenleaf marijuana; that Olivas then gave a prearranged signal to officers in the patrol car, and defendant was thereupon arrested. A search of the premises revealed that defendant had in his home 45 baggies of marijuana and 73 grams of hashish, and it was Olivas' opinion that these quantities were possessed by defendant for future sale.

Martin Wynne testified for the defense that he was a minister of the New Genesis Congregation which had certain sacraments, including marijuana, which were available only to ministers. Marijuana was grown also by church members. The New Genesis Congregation had a charter with the Universal Life Church. The members did not worship marijuana but used it to enhance a spiritual or mental state and accepted donations for it.

Defendant Torres testified and admitted giving a baggie of marijuana to Deputy Olivas in the ministry office and Deputy Olivas gave him two $10 bills while he gave the deputy $5 change.

Defendant was found guilty in both cases and was sentenced to prison with sentences to run concurrently.

## ISSUES

Defendant contends on appeal (1) that the trial court erred as a matter of law in both cases by failing to give defendant sufficient warning as to the dangers of self-representation; (2) that defendant's use of marijuana is protected by the free exercise clause of the First Amendment; (3) that the trial court erred in case No. 30568 by refusing to excuse a juror for cause; (4) that in case No. 32389 there was as a matter of law insufficient evidence to support defendant's conviction; (5) that the trial court erred in failing to instruct the jury *sua sponte* that

defendant was a target of selective law enforcement; (6) that the trial court erred in failing to advise defendant of his Fifth Amendment privilege against self-incrimination prior to defendant's testifying in both cases; (7) that the prosecutor committed misconduct by making racial slurs against defendant during closing argument; and (8) that the trial court erred in denying defendant probation because defendant's probation report contained inaccurate information and should not have contained a specific recommendation as to sentence.

DISCUSSION

I

■ Defendant contends that the trial court erred in both cases by not adequately admonishing defendant of the dangers of self-representation.[7]

---

[7]In Case No. 32389, the following colloquy took place between defendant and the trial court:

"THE COURT: People vs. William Alexander Torres. Defendant is present. Let's see, Mr. Torres, you appeared on your own behalf in the Municipal Court. Did you wish to have counsel represent you in this court in the matter?

"MR. TORRES: Not at this particular time.

"THE COURT: I've seen you in court and observed you in court, and in terms of whether you understand the nature of the proceedings and understand the nature of the disadvantage you're at, I don't have much doubt about that. I guess for the record I should inquire; what was the extent of your education in terms of formal grades of school?

"MR. TORRES: In terms of school training, I dropped out of the tenth grade, but I don't think that is where education comes from. I think that's where training comes from. I think education comes from the process of inquiry.

"THE COURT: And you hear all right; you don't have a hearing disability?

"MR. TORRES: No, I do not.

"THE COURT: And you see all right?

"MR. TORRES: Yes.

"THE COURT: And how is your reading; are you able to read?

"MR. TORRES: Physically in good shape, and I know how to read, your Honor.

"THE COURT: Okay. Do you understand that, for the record, seems kinda—really some of the things we need to do—some of these inquiries should be made a part of the record, and you understand that if you do represent yourself in this matter that you can't come back later and say, 'Well, I had an incompetent attorney so I want the matter reversed because I didn't understand some of the legal implications of what was going on.'

"MR. TORRES: I understand.

"THE COURT: And you understand the public—or that the District Attorney is an expert in the law and naturally it is expected that you would be at a technical disadvantage in terms of some of your knowledge of proceedings and the procedure.

"MR. TORRES: I understand that I would be at a disadvantage as far as administra-

In *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], the United States Supreme Court held that a defendant has a constitutional right to proceed in propria persona when he intelligently and knowingly elects to do so.

*Farretta v. California, supra*, 422 U.S. 806, does not, however, specify a mandatory procedure for the trial court to use in arriving at a determination as to whether a defendant is adequately informed and understands the dangers of self-representation. "The real task which confronts the trial court, when a defendant insists on proceeding without counsel, is to do whatever the circumstances then and there require to satisfy itself that the defendant in so doing has made a knowing and intelligent election." (*People v. Barlow* (1980) 103 Cal.App.3d 351, 365 [163 Cal.Rptr. 664].)

---

tive law is concerned. I don't have too much training in it, but I'm willing to take my chances.

"THE COURT: All right. Want to go ahead. The Court would find that he is able to represent himself."

In case No. 30568, the following colloquy took place between defendant and the trial court:

"THE COURT: Do I understand that you are making a motion to represent yourself in this case?

"MR. TORRES: Yes, sir.

"THE COURT: Mr. Torres, are you ready to proceed today?

"MR. TORRES: Yes.

" . . . . . . . . . . . . . . .

"THE COURT: Now, I'm sure Judge Lewellen advised you against appearing in pro per, and I certainly would, too, and I did ask him if he delved into all the problems that arise, and he indicated that he had. And I'm still going to do it myself for the purposes of this case.

"MR. TORRES: Do what? I am sorry.

"THE COURT: I still am going to ask you some questions to make sure that you know what you are doing and that—

"MR. TORRES: Um-hum.

"THE COURT: I will say it. As long as you are aware of the pitfalls, and knowingly and intelligently elect to waive the right to counsel, that you do have the right to represent yourself. The Court is under an obligation to advise you that you are going to operate at a tremendous disadvantage, and you have very skillful counsel who has tried, I think I heard you say the other day, two or three hundred felony trials.

" . . . . . . . . . . . . . .

"THE COURT: Be that as it may, you do have the right. But you understand you are not going to be shown any special favors. You understand that? That you are going to have to adhere to the rules of law.

"MR. TORRES: Um-hum. Okay.

" . . . . . . . . . . . . . . .

"THE COURT: And the rulings of this Court, and if you start rambling around in some areas or ask questions that are not relevant, and this is an objection made, I'm going to rule on them legally as though you were the most skillful lawyer in the country. Do you understand that?

"MR. TORRES: I understand that."

In case No. 32389, when defendant made a motion to proceed in propria persona at his arraignment the trial court stated that, having observed defendant in court, it had little doubt that he understood the nature of the proceedings and the disadvantages of self-representation. The trial court then conducted an inquiry into defendant's educational background and his faculties, advised defendant that he would not be able to raise his own incompetence on appeal if he conducted his own defense, and that he would be at a disadvantage since the district attorney was an expert in the law. Defendant replied: "I understand that I would be at a disadvantage ... but I'm willing to take my chances."

In case No. 30568, defendant made a motion to proceed in propria persona on October 30, 1980, the day set for trial. The trial court indicated that defendant had already been advised of the dangers of self-representation in case No. 32389 but that the court would conduct an independent inquiry. The trial court then informed defendant that although he had the right to represent himself, he would be operating at a great disadvantage and would, in so doing, relinquish the assistance of an experienced defense counsel; that his decision to represent himself would, in the trial court's opinion, be a bad mistake; and that if defendant elected to represent himself he would receive no special favors and would be treated as if he were a qualified lawyer. Defendant stated that he understood by representing himself he would be operating at a severe disadvantage and he does not claim that he did not make an informed and intelligent decision to represent himself.

The record makes it clear that the trial court in both cases adequately warned defendant of the dangers of self-representation.

## II

■ Defendant contends that his use of marijuana is protected by the free exercise clause of the First Amendment.[8]

The Health and Safety Code statutes which deal with the use, possession, and sale of marijuana and hashish were enacted pursuant to a legislative determination that such laws promote the public health, safety,

---

[8]The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The First Amendment is made applicable to the states through the liberty component of the Fourteenth Amendment. (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900, 128 A.L.R. 1213].)

and welfare, and are necessary for the protection of society. (*People* v. *Aguiar* (1968) 257 Cal.App.2d 597 [65 Cal.Rptr. 171].)

Defendant argues that these statutes unconstitutionally infringe upon the free exercise of his religion by prohibiting his use of marijuana, a sacrament in the New Genesis Congregation Church. In support of his argument defendant invokes the principles established in *People* v. *Woody* (1964) 61 Cal.2d 716 [40 Cal.Rptr. 69, 394 P.2d 813].

In *Woody*, the defendants, a group of Navajo Indians, performed religious ceremonies involving the use of peyote. In *Woody* the evidence indicated that peyote was to the defendant Indians not only a sacrament, but was an actual object of worship "similar to bread and wine in certain Christian churches." (*People* v. *Woody, supra*, 61 Cal.2d at p. 721.)

In reversing the conviction of the *Woody* defendants for violating former Health and Safety Code section 11500, the California Supreme Court held that "[t]he state may abridge religious practices only upon a demonstration that some compelling state interest outweighs the defendant's interests in religious freedom." (*People* v. *Woody, supra*, 61 Cal.2d at p. 718.) The court then articulated a twofold analysis with respect to the defense of religious freedom: First, it must be determined whether the statute in question imposes any burden upon the free exercise of the defendant's religion, and second, if there is such a burden, whether some compelling state interest justifies the infringement. (See *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790].)

In *Woody* the court held that defendants' use of peyote was such an integral part of their religious faith that it would be impossible to prohibit its use without inhibiting practice of the faith itself,[9] and therefore prohibition of the use of peyote would constitute a burden on the defendants' free exercise of religion. Since the use of peyote and the safeguards on its use prescribed by defendants' church had no antisocial consequences, and the danger of its misuse under claims of religious immunity was minimal, the state could demonstrate no compelling interest in applying former section 11500 to defendants.

---

[9]The court noted in its analysis the long history of peyote use among Indian tribes in America. By contrast, defendant in the instant cases began his church and the "religious" practice of smoking marijuana in July of 1979.

In both of the cases at bench, defendant himself testified that use of the marijuana is not an indispensable part of his religious faith, and that marijuana is not itself an object of worship. In case No. 30568, defendant testified that "We buy this thing called marijuana. And we smoke it; although there is no need. Nobody is mandated to smoke it . . . ."

Defendant's testimony makes it apparent that marijuana is not, as peyote was in *Woody*, such an integral part of defendant's religion that prohibition of marijuana will inhibit defendant's free exercise of religion. Furthermore, there was no evidence presented at defendant's trials indicating that defendant's church had prescribed safeguards against the dangers of misuse of marijuana. On the contrary, evidence of the numerous citizens' complaints suggested that marijuana was used by the New Genesis Congregation in an open and indiscriminate manner. Since the defense evidence fails to demonstrate that the requirements of *Woody* were met, defendant cannot claim First Amendment protection for his use of marijuana.[10]

### III

Defendant further contends that the trial court erred in case No. 30568 by refusing to excuse a juror for cause.[11]

---

[10]Defendant also contends that the use of informers to enter his home in order to make drug purchases "violated the spirit of the First Amendment regarding separation of church and state," and that the search of his home by sheriff's deputies violated the free exercise clause of the First Amendment. Since we hold that defendant's use of marijuana was not protected under the First Amendment, it is unnecessary to address these contentions.

[11]During the selection of the jury in case No. 30568 the following colloquy transpired between defendant, a prospective juror, the prosecutor, and the trial court:

"MR. TORRES: Do think that knowing that I smoke marijuana with young children would bias you to the point that you might be extremely angry at me because of my behavior, and you would be prejudiced against me?

"MRS. GARCIA: To be very honest with you, I would be.

" . . . . . . . . . . . . . .

"MR. TORRES: I wonder if I would be proper to ask Mrs. Garcia something whether or not she would sit on the jury knowing that information may be brought to light saying that I smoked marijuana with young people; I didn't ask their age.

"MRS. GARCIA: Well, I would try to be fair. But I am totally against it.

" . . . . . . . . . . . . . .

"MR. TORRES: Would it be proper to ask—excuse Mrs. Garcia for cause?

"THE COURT: There is no charge here involving furnishing marijuana to minors.

"MR. SCOTT: Your Honor, I think as Mr. Torres suggests, there may be during the course of the evidence, testimony about young people and Mr. Torres smoking marijua-

Section 1073 of the Penal Code provides in pertinent part that a challenge for cause based on actual bias will lie for "the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party. . . ."

■ Generally, the question whether a prospective juror has a prejudiced state of mind amounting to actual bias is an issue of fact left to the sound discretion of the trial judge. (*People* v. *Earnest* (1975) 53 Cal.App.3d 734, 749-750 [126 Cal.Rptr. 107].)

■ In case No. 30568, it is clear that juror Garcia consistently affirmed her willingness to act impartially in weighing the evidence and to do her best to apply the law as instructed. Even if some of Garcia's statements seem to conflict with these affirmations, it is the rule that "[w]here a prospective juror gives conflicting answers to questions rel-

---

na together. I believe his point is if that fact were brought to light, Mrs. Garcia would not be fair. She said she would try to be fair.

"MR. TORRES: But just completely against it.

"MRS. GARCIA: I am completely against it, but I would try to be fair.

"THE COURT: Let me ask you this, Mrs. Garcia: If there was evidence that the defendant smoked marijuana with minors, I'm not saying how the minors got it. Everybody met and they all had their bit of marijuana and some of them were minors. Would that fact prejudice you so much against the defendant that you just would almost automatically say guilty to the charges that he is charged with?

"MRS. GARCIA: I wouldn't say guilty. I would have to weigh whatever other evidence is brought.

". . . . . . . . . . . . . . . .

THE COURT: The question that Mr. Torres raised is not an improper one. And I think Mr. Scott indicated that. That is, whether some aspect of this case would, if true, would prejudice you so badly, as to the other aspect, which is the charge, that maybe you could not be impartial—

"MRS. GARCIA: I think maybe I should be asked to be excused.

"MR. SCOTT: I would hope we would all be against an adult providing marijuana to a minor. But the point is, he's not charged with that offense. He's charged with selling it. Not necessarily to a minor, but to Mr. Rich Gibson, really. The fact that the evidence may develop during the course of this transaction between Mr. Gibson and Mr. Torres, there were minors there, or that Mr. Torres passed them a marijuana cigarette and they smoked it. Is that fact alone going to so prejudice you about the case he's on trial for; selling marijuana to Mr. Gibson; that you couldn't be fair about the case that is front of you?

"MRS. GARCIA: I think I could be fair, providing he's not charged with selling to minors.

"MR. SCOTT: Even if those facts came to light during the course of the trial, you could be fair as far as evaluating the sale counts?

"MRS. GARCIA: As far as marijuana, it is not the strongest drug that there is, but it's a beginning to other things. This is why I oppose it.

"MR. SCOTT: Can you be fair on the charges he's now facing?

"MRS. GARCIA: I believe I can fair, but if you wish to excuse me—

"THE COURT: I am going to disallow the charge. You still have the right to exercise a peremptory. You are aware of that?

"MR. TORRES: Yes."

evant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. [Citations.]" (*People v. Linden* (1959) 52 Cal.2d 1, 22 [338 P.2d 397].) No error appears in the refusal of the trial court to grant defendant's challenge to this juror for cause.[12]

## IV

Defendant contends that since the prosecution in case No. 32389 failed to prove that the marijuana which was obtained from defendant's residence by sheriff's deputies was in fact cannabis sativa L,[13] there was no sufficient evidence on which to base his conviction.

In *People v. St. Amour* (1980) 104 Cal.App.3d 886, 895 [163 Cal.Rptr. 187], the appellate court held that "[T]here is no legal requisite that the prosecution should specify and prove the species of marijuana which form the basis of the charged violation."

In case No. 32389, Sandra Rakestraw, a criminalist, testified that the substance obtained from defendant's residence was marijuana. This testimony, together with the other evidence adduced at trial by the prosecution, was sufficient on which to base defendant's conviction of violating Health and Safety Code sections 11357, subdivision (a), 11359 and 11360, subdivision (a).

## V

Defendant further contends that the trial court erred in failing to instruct the jury *sua sponte* that defendant was the target of selective law enforcement in both cases.

---

[12]Defendant also contends the trial court in case No. 32389 erred in refusing defendant's request for three additional peremptory challenges. Since defendant fails to show why such additional peremptory challenges should have been granted, there are no facts on which to base a determination that the trial court erred. Defendant's argument is without merit.

At the same time defendant made a motion to challenge the entire jury panel on the basis that defendant could not see any of his church members on the panel and as a result the jury was not composed of his peers. The trial court denied the motion as untimely. Defendant now argues that the trial court erred in refusing to grant his motion to challenge the entire jury panel. Since defendant makes no showing that the jury had been improperly selected, his argument is without merit.

[13]Section 11018 of the Health and Safety Code defines marijuana as "all parts of the plant Cannabis sativa L, whether growing or not ...."

In order to establish a claim of discriminatory enforcement of the law, a defendant must demonstrate that he is being deliberately singled out for prosecution on the basis of some invidious criterion. (*Murgia v. Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44].)

Defendant claims that "he was singled out for prosecution in both matters because he was not popular in the community and his religious practices and beliefs were a malediction." The evidence at trial, however, suggested that defendant's drug activities were investigated by the sheriff's department as a result of numerous complaints made by citizens who had observed persons in the area of defendant's residence using drugs. The court, therefore, was under no duty to *sua sponte* instruct the jury that defendant was a target of selective law enforcement.[14]

## VI

Defendant next contends that the court failed to advise him of his Fifth Amendment rights against self-incrimination prior to the time he took the stand and testified in both cases.

It is well-established that "'when an unrepresented defendant is about to take the stand in a criminal case, the court must make certain that the defendant is aware of his constitutional privilege not to testify.'" (*People v. Jackson* (1978) 88 Cal.App.3d 490, 497 [151 Cal.Rptr. 688].)

However, a trial court's failure to instruct an unrepresented defendant on his privilege against self-incrimination constitutes harmless error where "there can be no reasonable doubt that the verdict would have been the same had appellant been warned by the trial court ... refrained from taking the stand." (*People v. Jackson, supra*, 88 Cal. App.3d at p. 500.)

In the two cases at bench the record reflects that on at least one occasion in each trial the trial court instructed defendant that he did not

---

[14]Defendant also contends that the surreptitious manner in which sheriff's deputies obtained marijuana from him constituted entrapment, and therefore his conviction should be overturned. The record is replete with evidence of defendant's practice of selling marijuana to his church members. In light of this, defendant's entrapment argument is patently without merit.

have to testify if he did not wish to. Furthermore, the evidence presented against defendant by the prosecution was so overwhelming that even had defendant not testified, there can be no reasonable doubt that he would have been convicted. Defendant's own testimony established the elements of the crimes of which he was convicted. Accordingly, even if the trial court's statements to defendant did not constitute sufficient warning of his Fifth Amendment privilege, the resulting error was harmless beyond a reasonable doubt.

## VII

■ Defendant contends further that his convictions should be reversed because the prosecutor made racial slurs against defendant during the closing arguments in both cases by referring to defendant as a "Don Quixote."

The general rule is that prosecutorial misconduct which results in denial to defendant of a fair trial constitutes reversible error. (*People* v. *Bolton* (1979) 23 Cal.3d 208 [152 Cal.Rptr. 141, 589 P.2d 396].) However, "[I]n the absence of prejudice to the fairness of a trial, prosecutor misconduct will not trigger reversal." (*People* v. *Bolton, supra,* 23 Cal.3d at p. 214.)

In the cases at bench, the prosecutor's reference to defendant as a "Don Quixote" cannot be fairly characterized as a racial slur. The remarks were directed to defendant's actions, not his race and even if the remarks were improper, they were not so prejudicial to defendant's case as to require reversal.

## VIII

■ Defendant finally contends that the trial court erred in denying defendant probation because the probation report on which his sentence was based did not accurately reflect the factors in aggravation and mitigation, and that the probation officer should not have recommended the actual sentence to be imposed but should have recommended only whether defendant should be given probation.

The probation report, which was filed in an augmentation to the clerk's transcript on appeal, states in pertinent part that before sentencing "[t]he defendant submitted a memorandum to the Court, refusing probation, stating, 'Therefore, with due consideration for the opinions of

mankind and of those who have judged him, given the knowledge that probation is a kindly act of judicial sympathy, the defendant, with faith in the omnipotence of the truth, refuses any and all probationary terms, and without regard for any of the acts allegedly committed, disclaims all criminal intent and demands justice.'"

Since defendant made no objection to the contents of the probation report in the trial court and further indicated that he would reject probation, he is in no position now to claim that the trial court erred in complying with his wishes. In any event the trial court properly considered, though it was not bound by, the contents of the probation report in reaching its decision with respect to sentencing. (*People* v. *Kingston* (1974) 44 Cal.App.3d 629, 637 [118 Cal.Rptr. 896].) Nor is there any showing that the trial court abused its discretion in failing to order a diagnostic report on defendant. No basis for such a report was presented by trial counsel and the trial court is not required to call for a diagnostic report unless it deems the study essential to its just disposition. (See e.g. *People* v. *Harris* (1977) 73 Cal.App.3d 76, 85 [140 Cal.Rptr. 697].)

## DISPOSITION

The judgments of conviction are affirmed.

Spencer, P. J., and Lillie, J., concurred.