[Crim. No. 22063. First Dist., Div. One. Mar. 22, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY CLAY et al., Defendants and Appellants.

438

440

COUNSEL

Quin Denvir, State Public Defender, under appointments by the Court of Appeal, Neil Rosenbaum, Deputy State Public Defender, Benjamin R. Winslow, Winslow & Schmidt and Carlos Ernesto Duque for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Ronald E. Niver and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

NEWSOM, J.—Defendants below Larry Clay, Tommy Hart, Bobby Varner, and Frank White appeal on numerous grounds their criminal convictions on multiple counts, as shall appear more particularly below.

The convictions arise from a series of shocking atrocities which may be summarized as follows.

On June 3, 1980, Paula H. resided in a multistory flat on Union and Fillmore Streets in San Francisco. She operated an astrology practice from an office on the ground floor and rented rooms on the upper floors.

At 3:45 in the afternoon two men, subsequently identified as appellants Clay and Hart, rang Mrs. H.'s doorbell and stated they were interested in a room which was advertised for rent. Mrs. H. was alone in the apartment at the time. She showed the room to the two men, then took them to her husband's office to show them a rental agreement. After looking over the agreement, Clay said that he wanted to see the room again. As Mrs. H. stood up, Clay pulled a gun and held it to her head. Clay asked for money, whereupon Mrs. H. pointed to a drawer. Hart rummaged through the drawer and removed some money. Clay then demanded more money. Mrs. H. directed them to a cash box, from which Hart removed small change.

Clay then pushed Mrs. H. out of the office, down the hall, and into an adjoining room at gunpoint. Hart shut the door to the room. Clay ordered Mrs. H. to lie face down on the bed, and proceeded to sodomize her against her will. When Clay finished, he got up and stood by the door with the gun in his hand while Hart raped Mrs. H. When Hart was finished, the two men bound Mrs. H.'s hands and feet before fleeing from the building.

Mrs. H. was able to free herself and call the police. Two days after the incident, she positively identified Clay's photo from a police spread as that of the man with the gun who sodomized her. The following day, she positively identified Hart from a photo spread as the man who raped her. At the preliminary hearing, Mrs. H. again positively identified both Clay and Hart from a group of four black men.

Later on the same evening of June 3, Clay and Hart met appellants Varner and White in the apartment of Hart's sister. There they formulated a plan to rob the Keys Residential Care Home. Clay, who was armed and in charge, was supposed to hold a security guard while the others removed a safe.

The four men arrived at the nursing home, where White boosted Hart through an open window. Rudolph Ochoa, a night supervisor at that facility, heard noises at the front door. Upon nearing that entrance he saw Hart opening the door from the inside for the other three appellants.

Clay approached Ochoa, told him to keep quiet, and hit him on the forehead with a pistol. Ochoa fell to the floor, his wound subsequently

requiring stitches to close. According to Ochoa, two men went upstairs while Clay searched the first floor rooms. Ochoa testified that Clay was gone for four to five minutes. Clay returned and asked Ochoa "Where's the money?" while placing his foot on the latter's neck. Ochoa replied that he did not know: someone then removed the wristwatch from his wrist and $2 from his wallet.

According to the testimony of Frank White, who was the only defendant to testify at trial, he and Varner were the two men who went upstairs. There, Varner worked from the front to the rear of the building and White in the opposite direction. White entered the room occupied by 77-year-old Andres Palileo and his wife Perla, exclaiming "I need money, I need money." When White found no money in the woman's purse, she told her husband to surrender his wallet. Palileo retrieved his wallet from a drawer and handed it to Mrs. Palileo, who gave it to White. White removed $30 and returned the wallet. When White left, the Palileos sat together and prayed.

Varner entered Paul Eriksen's second floor room, said he was an inspector and withdrew. Eriksen followed him downstairs where he encountered a man with a gun. The man with the gun took Eriksen's money, but did not hit him. Eriksen said that he saw other rest home occupants who had been hit and were sitting or lying on the floor.

Andrew McDonald, age 76, returned from the bathroom to his second floor room to find two men ransacking his dresser drawers. He was kicked in the stomach and struck in the head by a blunt instrument, after which he fainted. He received six stitches at the hospital. Nineteen dollars was taken from his pocket.

Seventy-seven-year-old Fritz Petersen occupied a second floor room at the top of the stairs. A man with a chrome-plated .38 caliber gun entered his room, hit him on the forehead with the pistol, took $50 from him and kicked him down the stairs. Petersen's head wound required five stitches.

On the first floor, Claudia Chow shared a room with Mary Fchasun. A man entered their room holding a pistol and demanded money, hitting Chow hard in the forehead. Neither Ms. Chow nor Ms. Fchasun had any money. Chow later received three stitches for her head injury.

Constance J. shared another first floor room with Margaret T. Ms. J. was awakened in bed by a man with a gun who tore off her nightgown, struck her on the head with a gun, took her money, and removed $2 and a watch from her purse. Seven sutures were required to close her head wound. Ms.

J. selected a picture of appellant Clay from a photo lineup, identifying him as the man who hit her.

Margaret T., age 67, had been totally blind for 6 years. For the previous 11 years she had been visually handicapped as the result of a mugging. Mrs. T. stepped from her bedroom into the hallway en route to the bathroom, her purse over her arm. Someone grabbed her, threw her on the floor, and took the purse. A man then jerked Mrs. T. to her feet and guided her into the first floor bathroom, where he put her down on the tile floor and warned her not to move. The man returned and took her money, tore off her night-gown, raped her, and forced her to orally copulate him.

Margaret T. testified that the man was cleanshaven, and that he was not overly heavy. She said that the entire incident lasted more than 10 minutes, and possibly as long as a half hour.

White testified that when he reached the downstairs area he saw four or five elderly people lying against the wall, bleeding. Clay was standing over them, holding a gun. He did not see Hart or Ms. T. He turned to Varner and suggested they leave, whereupon the two fled with the others close behind. The four regrouped back at the house of Hart's sister.

Composite drawings were made with the help of Ochoa, and Hart and Clay were arrested on the basis of these drawings on June 6. On the same day, Varner and White fled by bus to Alabama. They were intercepted and arrested in Salt Lake City, Utah.

Clay and Hart were tried separately for the crimes not involving the other defendants (the rape and robbery of Paula H.). As to this incident, Clay was convicted of one count of burglary (Pen. Code, § 459), one count of assault with a deadly weapon likely to produce great bodily injury (Pen. Code, § 245, subd. (a)), one count of forced sodomy (Pen. Code, § 286, subd. (d)), one count of aiding and abetting a rape (Pen. Code, §§ 261.3, 264.1), one count of robbery (Pen. Code, § 211), one count of false imprisonment (Pen. Code, § 236), and one count of unlawful possession of a concealed firearm (Pen. Code, § 12021). The jury also found that appellant used a firearm to commit all but the last of these offenses.

Hart was found guilty of one count of burglary (Pen. Code, § 459), one count of assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)), one count of sodomy in concert (Pen. Code, § 286, subd. (d)), one count of rape (Pen. Code, § 261, subd. 2) with the allegation that the act was done in concert (Pen. Code, § 264.1), one count of robbery (Pen. Code, § 211), and one count of false imprisonment (Pen.

Code, § 236). The jury also found that a principal (Clay) in each of these offenses was armed with a gun.

As to the charges relating to the victims in the Keys Rest Home, all four defendants were tried together. Clay was found guilty of one count of burglary, five counts of assault producing great bodily injury, eight counts of robbery, two counts of attempted robbery, personal use of a firearm, and possession of a concealable firearm by an ex-felon. Hart was found guilty of burglary, five counts of assault, eight counts of robbery, rape, oral copulation, and two counts of attempted robbery, each with arming enhancements. Varner and White were both found guilty of burglary, five counts of assault, eight counts of robbery, and two counts of attempted robbery, again with arming enhancements.

Clay was sentenced to 41 years, Hart to 51 years, and Varner and White 11 years in prison.

I

We consider first among the many contentions on appeal the venue issue.

■■■ Appellants twice petitioned the trial court for a change of venue on grounds that there was a reasonable likelihood they could not receive a fair trial in San Francisco. Appellants here contend that the denial of this requested venue change constitutes reversible error.

■■■ "A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. [Citations.] Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable. [Citations.] The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, and the popularity and prominence of the victim. [Citation.]" (*People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240], cert. den. 454 U.S. 882 [70 L.Ed.2d 192, 102 S.Ct. 365].)

■■■ However, " 'A significant difference between pretrial and posttrial review is that after conviction in determining whether a defendant received a fair and impartial trial under the "reasonable likelihood" standard, the review is *retrospective*. It extends to an examination of what actually occurred at trial.' [Citation.] In other words, voir dire may demonstrate the pretrial publicity had no prejudicial effect. [Citations.]" (*People* v. *Harris,*

*supra,* p. 949, quoting from *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 13 [147 Cal.Rptr. 208].)

The first of these factors—the nature and gravity of the offense—weighs in favor of a change of venue. Appellants were charged with numerous offenses against elderly and handicapped residents of a rest home. All were charged with rape and forcible oral copulation of an elderly blind woman. All were accused of armed robberies and aggravated assaults. The repulsive and outrageous nature of the crimes as well as the gravity of the possible consequences upon conviction militate in favor of a change of venue. The second factor—the nature and extent of the news coverage—also weighs in favor of appellants' motion. The news media gave the incident prominent and extensive coverage, while the crimes at issue were so heinous that mere recitation must necessarily have inflamed the passions of the reading public.

The third factor, however—the size of the community—weighs against change of venue. The "adversities of publicity are considerably offset if trial is conducted in a populous metropolitan area." (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 189 [132 Cal.Rptr. 265].) "Thus, when, despite extensive and even sensational coverage, a trial is scheduled in a populous urban area [citations] the courts have denied petitions for change of venue. On the other hand, when trial is scheduled in a small rural community, even though the publicity is not inflammatory and not hostile toward the defendant, the courts have granted such a change." (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 581 [174 Cal.Rptr. 701, 629 P.2d 502].)

The fact, then, that appellants were tried in California's third largest city, with a cosmopolitan and heterogeneous population inured to violence, indicates the possibility of securing jurors unaffected by pretrial publicity and militates against a change of venue. We also note that this factor alone—size of the community—has been held sufficient to "tip the balance" against venue change. (See *People* v. *Harris, supra,* 28 Cal.3d at p. 949.)

Other factors, such as the status of the defendants and the prominence of the victims—are but dubiously relevant. The appellants, for example, are relatively anonymous local residents who were not "viewed by the press as . . . outsider[s], unknown in the community or associated with a group to which the community is likely to be hostile." (*Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 940 [187 Cal.Rptr. 455, 654 P.2d 225].) The victims, prior to their victimization, were not exceptionally visible members of the community to the extent recognized by the courts in *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287 [95 Cal.Rptr. 798, 486 P.2d 694] (prominent local physician, founder of local hospital), or *Maine* v. *Superior Court*

(1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372] (popular teenage couple from prominent families in town of 10,000 people).) And while it is true that by virtue of the media coverage of the crimes they attained a variety of "posthumous celebrity," it is their status as helpless victims that propelled them to prominence. Further, while San Francisco reacted to their plight with extreme outrage, such hostility would doubtlessly have followed the perpetrators to any community in the state to which venue would have been transferred. (See *Odle* v. *Superior Court, supra,* at p. 942.)

We are thus here presented a situation in which some factors (nature and gravity of the offenses and nature and extent of the news coverage) supported a change of venue, one factor (size of the community) argued against such a change, and two factors (the respective statuses of the accused and victim) were neutral. Thus, our *retrospective* review for any actual (as opposed to hypothetical) prejudicial effect of pretrial publicity becomes especially critical.

■ In this regard, we reiterate our observation that " '[p]retrial publicity—even pervasive, adverse publicity—does not invariably lead to an unfair trial.' [Citations.]" (*People* v. *Mendonsa* (1982) 137 Cal.App.3d 888, 895 [187 Cal.Rptr. 363].) "[I]t should be emphasized that the controlling cases 'cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.' (*Murphy* v. *Florida, supra,* 421 U.S. [794] at p. 799 . . . .) 'It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion of the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 . . . .)" (*People* v. *Harris, supra,* 28 Cal.3d 935, 949-950.)

■ In the case at bench, to select 12 jurors 78 were examined; to select 4 alternatives another 10 were questioned. Only a handful of prospective jurors had not heard of the case. Of the 26 veniremen excused for cause, only 8 were excused because of opinions formed by pretrial publicity.

Of the twelve jurors who sat on the case, two of them had not read about the incident at all, nor heard or seen anything related to it on radio or television. One juror neither owned a television nor subscribed to a newspaper. Two others stated that their exposure to the case was limited to one or two newspaper articles about it. None of the jurors expressed a belief in the guilt of any of the appellants, and all indicated that they could keep an open mind and base their verdict on the evidence presented at trial. Our review thus indicates that pretrial publicity did not deny appellants their right to a fair and impartial jury, and that accordingly the denial of the motion to change venue did not constitute reversible error.

## II

Appellants next claim reversible error in the jury selection process. They attack that process on two grounds. ▉ First, they claim the trial court erred in denying their challenges directed to six prospective jurors for actual bias generated by adverse publicity, thus forcing them to expend peremptory challenges to excuse these veniremen. ▉ Second, appellants claim that, based upon their motion made pursuant to *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], the trial court should have dismissed the venire on grounds of the People's improper (i.e., racially discriminatory) use of peremptory challenges.

▉ Addressing first the contention that the trial court improperly dismissed the defense challenges for actual bias, we note that "The primary purpose of voir dire is to determine the competency and qualification of particular jurors to serve (Pen. Code, §§ 1066-1089); the conduct of the voir dire and the qualification of jurors challenged for cause are matters within the wide discretion of the trial court, seldom disturbed on appeal. [Citation.] ▉ To find actual bias on the part of an individual juror, the court must find 'the existence of a state of mind' with reference to the case or the parties that would prevent the prospective juror 'from acting with entire impartiality and without prejudice to the substantial rights of either party.' (Pen. Code, § 1073.) The basic common law requirement of entire or strict impartiality expressed in section 1073 has seemingly been modified by section 1076 which permits qualification of a juror who admits exposure to and influence by pretrial publicity, but declares credibly that he can act impartially. Section 1076 thus serves the rule of necessity in permitting impanelment of a jury in those cases where, due to modern methods of communication and news reporting, it would be virtually impossible anywhere in the state to secure a jury with no knowledge or opinion of some

sort concerning a notorious case."[1] (*Odle* v. *Superior Court, supra,* 32 Cal.3d at p. 944.)

■ Furthermore, "The question of whether a prospective juror has a prejudiced state of mind amounting to actual bias is ordinarily an issue of fact left to the sound discretion of the trial judge." (*People* v. *Earnest* (1975) 53 Cal.App.3d 734, 749-750 [126 Cal.Rptr. 107]. Accord: *People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103]; *People* v. *Torres* (1982) 133 Cal.App.3d 265, 278-279 [184 Cal.Rptr. 39]; *People* v. *Caldwell* (1980) 102 Cal.App.3d 461, 475 [162 Cal.Rptr. 397].)
■ "It is also the rule that 'Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. . . .'" (*People* v. *Earnest, supra,* 53 Cal.App.3d at p. 750. Accord: *People* v. *Daugherty* (1953) 40 Cal.2d 876, 890 [256 P.2d 911], cert. den. 346 U.S. 827 [98 L.Ed. 352, 74 S.Ct. 47]; *People* v. *Torres, supra,* 133 Cal.App.3d at pp. 278-279; *People* v. *Caldwell, supra,* 102 Cal.App.3d at p. 474; *People* v. *Thompson* (1924) 68 Cal.App. 487, 492 [229 P. 896].)

■ We think the wisdom of the rule of deference to the trial courts in these matters is aptly illustrated by the following exchange taken from the voir dire in the present case—extracted from the questioning of one of the jurors appellants claim should have been removed for cause, and in our opinion, typical of the voir dire of each of the challenged prospective jurors.

"[By Defense Counsel]: Do you when you read this in the newspaper, how many times did you read about it? . . .

"A. I would say about two or three times. I can't say exactly, but I did read it.

"Q. That was over about like a one-week period, from the time of the incident until the people were arrested?

"A. Until it died down.

---

[1]Penal Code section 1076 provides: "In a challenge for implied bias, one or more of the causes stated in section one thousand seventy-four must be alleged. In a challenge for actual bias, the cause stated in the second subdivision of section one thousand seventy-three must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals, circulars, or other literature, or common notoriety; provided, it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him. The challenge may be oral, but must be entered in the minutes of the court or of the phonographic reporter."

"Q. You remember when the incident occurred there was a big outrage about it?

"A. Um-hum.

"Q. And people—people expressed a lot of shock and indignation about it?

"A. Um-hum.

"Q. I take it you felt very much the same way.

"A. Yes, very upset.

"Q. When the people were apprehended, people were arrested for this, did you feel some sense of relief?

"A. Sure did.

"Q. Did you feel even glad they got them?

"A. Um-hum.

"Q. Did you feel the people arrested were probably the people who did it or they wouldn't have been arrested?

"A. Yes.

"Q. So, as you sit there now, what you are saying is you feel that the four defendants seated in the courtroom at this time are probably guilty?

"A. No, because I have to hear all the evidence now presented and base it that way. . . .

"Q. Okay. Are you saying on the one hand you feel they are probably guilty but you would like to hear what is presented in court?

"A. That is right.

"Q. As the defendants sit there, do you presume them to be innocent at this time?

"A. Until proven guilty.

"Q. What about the other feeling you have that they are probably—that the people who were arrested were probably guilty? Is that still with you as you sit in the jury box?

"A. You see, reading this in the paper, you know, that always stayed with me. At the same time I guess one would have to have everything all presented before them, you know, and then base it that way. [¶] Maybe I am all wrong. You have to hear the truth. . . .

"Q. And I realize you may not have thought about that case since the last time you read it in the paper, but basically nothing changed your opinion from the time you read about it in the paper until the time you came to court?

"A. That is right.

"Q. Except the fact you are now in court and you are aware of the fact that the law says you have to presume them innocent?

"A. That is right.

"Q. You want to be fair in this case?

"A. That is right. I could be all wrong.

"Q. What you are saying is you are willing to put aside that opinion you had until yesterday and try and be fair in the case?

"A. That is right. . . .

"Q. Is that opinion you had before you walked through the doors yesterday still sitting inside you at this time?

"A. You mean that they are guilty, sir?

"Q. You have that feeling?

"A. Yes, uh-huh. . . .

"[By the People]: Q.. . . if the judge instructs you that the fact the defendants have been arrested is not evidence of their guilt, will you be able to follow that instruction?

"A. Yes, sir. Um-hum.

"Q. Will you be able to put side any evidence that you have heard because, in fact, it is not evidence?

"A. That is right.

"Q. Will you be able to put aside any information you have heard outside of this courtroom?

"A. Um-hum.

"Q. And decide this case solely and exclusively on the evidence that will be presented and on the law as His Honor will instruct you?

"A. Yes.

"Q. Do you feel, as you now sit there, you can give the defendants a fair trial?

"A. I certainly can."

From the foregoing (which, we reiterate, was typical of the answers and responses of each of the challenged jurors on the issue of publicity) exchange, it may be seen that typical answers in response to leading questions by experienced counsel skilled in the art of cross-examination tended both to establish disqualifications and to indicate competency. The trial court, not being limited to a mere examination of a faceless record, but instead uniquely positioned to evaluate the sincerity and credibility of the prospective veniremen, ruled in favor of their competency to sit as jurors. Absent any clear factual basis for doubting the correctness of the court's ruling, we regard ourselves as being bound by it.

Appellants, all of whom are black, also contend that the People improperly exercised peremptory challenges to exclude prospective jurors solely on racial grounds. Such a motive, if established, is clearly impermissible, even for challenges statutorily defined as those "for which no reason need be given."[2] (*People* v. *Wheeler, supra,* 22 Cal.3d 258.)

The principles of accommodation between the People's right to exercise peremptory challenges and a defendant's constitutional right to a jury drawn from a representative cross-section of the community, initially addressed by our high court in *Wheeler,* have recently been reaffirmed in *People* v. *Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854]. As set forth there-

---

[2]See Penal Code section 1069.

in: "We began 'with the proposition that in any given instance the presumption must be that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground.' ([*Wheeler*], at p. 278.) The presumption is, however rebuttable. . . . 'If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. . . . If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone. The showing need not rise to the level of challenge for cause. But to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein. . . .' ([*Wheeler*], at pp. 280-282.) . . . [¶] . . . it is imperative, if the constitutional guarantee is to have real meaning, that once a prima facie case of group bias appears the allegedly offending party be required to come forward with explanation to the court that demonstrates other bases for the challenges, *and* that the court satisfy itself that the explanation is genuine. This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' ([*Wheeler*] at p. 282.)" (*People* v. *Hall, supra,* 35 Cal.3d at pp. 167-168.)

In *Hall, supra,* a black defendant had established a prima facie case of group bias by demonstrating that five of eight peremptory challenges exercised by the prosecution were used to remove black jurors and that no blacks remained on the jury. Although the trial court called upon the prosecutor to explain these challenges, it made no serious attempt to evaluate the explanations proffered to determine whether they were bona fide.[3] The Supreme

---

[3]"The trial court declined any inquiry into or examination of the prosecutor's explanation. Stating that 'a peremptory challenge is a peremptory challenge, otherwise, it's meaningless,' the judge expressed a view that systematic exclusion of a class of potential jurors occurs only when the prosecutor announces an intent to keep all members of that group off the jury. In response to defendant's plea that he see the reality of the prosecutor's actions, the judge again explained his belief that systematic exclusion is demonstrated only if the prosecutor expressly states an intent to exclude all members of a class. His comment also reflected a belief that the court may not or need not refuse to accept a prosecutor's explanation even if the explanation appears to be disingenuous." (*People* v. *Hall, supra,* 35 Cal.3d 161, 165-166.)

Court reversed, holding that the trial court, in view of the ample evidence of disparity of treatment contained in the record, failed to exercise its judgment in determining whether the prosecutor's use of peremptory challenges was for reasons relevant to the case before it or reflected a constitutionally impermissible group bias.

In the case at bench, the People exercised four of ten[4] of its peremptory challenges against blacks, and no blacks ultimately sat on the jury.[5] We are thus satisfied that such a showing established a prima facie case of impermissible group bias. In response to this showing, the prosecution explained the peremptory challenges,[6] and the motion to dismiss the panel was denied. We are thus faced with the question, as our high court was in *People* v. *Hall, supra,* 35 Cal.3d 161, of whether the trial court satisfied its *Wheeler* obligation in light of that showing. (*People* v. *Wheeler, supra,* 22 Cal.3d 258.)

---

[4]We confine our discussion on this issue to the trial of all four defendants in the Keys Rest Home incident. While appellants Clay and Hart raised a similar *Wheeler* issue based on two peremptory challenges directed towards blacks in regard to their separate trial in the Paula H. assault, we are satisfied that such an objection did not establish a prima facie case of impermissible group bias. (See *People* v. *Rousseau* (1982) 129 Cal.App.3d 526 [179 Cal.Rptr. 892].)

We also note here that appellant Clay contends that the applicable ratio to be applied in the second trial should be 5 of 10 rather than 4 of 10, including in his count a Chicano juror and asserting that, rather than "blacks," the relevant cognizable group should be "non-whites." We agree with the trial court that "nonwhite" does not present a properly cognizable group for present purposes; and we further note that, if it did, those jurors with Asian surnames (three of whom were peremptorily challenged by the defense and none of whom were so challenged by the People) would have to be included: if this were the case, the defense could not be heard to complain of a situation it was equally instrumental in bringing about. We further note that three of the jurors who ultimately served bear Spanish surnames.

[5]We also note, as the People point out, that one black juror served as an alternate. We remain unpersuaded, however, that this fact refutes the prima facie case of group bias.

[6]The reasons given for excusing the prospective jurors were: As to the first juror—"I passed on numerous occasions when [she] was present, and I wished, in fact, to have her. But, as the Court realizes, the jury is constantly changing. When other people are removed from the panel, challenged by the defense, it changes the composition and the relationships between them. [¶] I mentioned to counsel I saw a positive relationship developing between [another juror] and [the juror here challenged]. [The other juror] was challenged; a young woman took her place. I didn't see the same kind of relationship developing."

As to the second juror—"[t]he record will reflect I asked he be excused for cause. He said, in no uncertain terms, he didn't think he could understand the issues going on; he could not be fair. I challenged him for that reason when my challenge for cause was refused."

As to the third juror—"I challenged [him] because I asked him a question, how he felt about the incident after he read it in the paper. It was a question often asked by defense counsel. He indicated it didn't affect him. Either he wasn't being fully upfront with us or his feelings were such that he didn't have much of an emotional feeling, much sympathy, much compassion. I didn't want someone like that on the jury."

As to the fourth juror—"There is a woman I just challenged because it was the old traditional gut reaction. I was not, could not did not—didn't feel I was going to be able to develop a rapport with her."

As *Hall* demonstrated, we must be sensitive not only to the possibility of disingenuousness on the part of the prosecution in its explanation of challenges, but also to the possibility of ingenuousness or alacrity on the part of the trial court in its acceptance of those explanations. We believe, however, that the facts of the instant case diverge from those in *Hall* in two critical respects. Here, unlike *Hall,* there appears no evidence that the trial court misunderstood its obligation under *Wheeler* to "reasonably and sincerely" evaluate the prosecution's explanations. And, again unlike *Hall,* no ample reason for suspicion in terms of disparate treatment is suggested: no such evidence was presented to the trial court and none is urged here on appeal. This being the case, recognizing and acknowledging as we must our extremely limited capacity to evaluate such qualities as sincerity and disingenuousness, we must "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 282.) For " '[T]rial judges . . . are in a good position to make such determinations, . . . on the basis of their knowledge of local conditions and of local prosecutors.' . . . They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience." (*Id.,* at p. 281.) In the absence, therefore, of any showing either of disparate treatment evidencing disingenuousness on the part of the prosecution, or that the trial court misunderstood its *Wheeler*-imposed obligations, we cannot conclude that our necessary reliance on the trial court has been in this instance misplaced.[7]

## III

We turn to the several alleged evidentiary errors which are urged upon us as grounds for reversal.

 Appellant Hart, who was convicted of the rape of Margaret T. and who did not testify at trial, sought to introduce evidence that at his sister's apartment immediately after the crime he had uttered a statement which the jury could have interpreted to implicate codefendant Varner rather than himself as the rapist.[8] The trial court ruled the statement inadmissible on grounds that it was self-serving hearsay as well as on grounds provided

---

[7] It should, of course, be "unnecessary to remind counsel, whether prosecutor or defender, of their legal and ethical responsibilities to seek justice and to offer only truthful reasons for the exercise of peremptory challenges." (*People* v. *Hall, supra,* 35 Cal.3d 161, 170, fn. 11.)

[8] The alleged statement to Varner was "man, you sick, doing that old woman that way."

by Evidence Code section 352.[9] Hart insists that his out-of-court statement should have been received as nonhearsay circumstantial evidence of innocence: not to prove the truth of his accusation, but rather to reflect that he was "repulsed" by acts of rape and forcible oral copulation.

We find the trial court's exclusion of this statement to have been proper. If offered to prove the truth of the matter asserted therein, it is hearsay, and not within any proferred exception. ██ Self-serving extrajudicial declarations by criminal defendants are inadmissible to prove the truth of what was said. (*People* v. *Williamson* (1977) 71 Cal.App.3d 206, 214 [139 Cal.Rptr. 222].) ██ If offered for nonhearsay purposes, then the trial court's finding that its (rather tenuous) probative value was outweighed by its prejudicial impact can be supported by sound reasons: admitting the statement as evidence that the rape and oral copulation of an elderly blind woman "repulsed" Hart would have made relevant and admissible Hart's convictions for the rape and sodomy of Paula H., committed about six hours before the sexual assault upon Margaret T. Apart from prejudice to Hart, that development might have resulted in undue consumption of time.

██ Appellant Hart also attacks the sufficiency of the evidence adduced in support of his convictions for the rape and forcible oral copulation of Margaret T. Conceding that the elderly blind woman was sexually assaulted, Hart argues that the evidence identifying him as the culpable codefendant was inadequate to prove guilt beyond a reasonable doubt to any rational trier of fact. ██ " 'It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond reasonable doubt. . . .' " (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382].) Thus, "In reviewing the evidence on appeal, the applicable test is not whether guilt has been proven beyond a reasonable doubt, but rather whether substantial evidence supports the conclusion of the trier of fact." (*People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887].) ██ "Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) ██ However, "The reviewing court does not perform the function of reweighing the evidence" (*People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887]), but "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755

---

[9]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[79 Cal.Rptr. 529, 457 P.2d 321].) ■ "[R]eversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding." (*Ibid.*) "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*Ibid.*) In short, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], quoted in *People* v. *Johnson, supra,* 26 Cal.3d at p. 576.)

■ Reviewing the evidence in this light, we are convinced that substantial evidence supports a conclusion that neither Varner nor White had the opportunity to assault the victim: the attack occurred in a first floor bathroom, and credible testimony of ponderable legal significance from a variety of witnesses places Varner and White on the second floor for the duration of the rampage. As to the possibility that Clay could have been the assailant, blindness did not prevent the victim from noting that her attacker's cheek was clean shaven. At the time of their arrests two days after the incident, Clay was bearded, mustachioed, and goateed, while Hart's cheeks were free of facial hair.[10] Also, from the fact that Clay was the only armed intruder and from the number of victims pistol-whipped on both floors, a rational trier of fact could find that Clay's time was otherwise occupied for the "four-to-five" minutes he was out of sight of the supervisor, Mr. Ochoa. Furthermore, White testified that when he came down from the second floor with Varner behind him, he saw Clay standing over four or five elderly victims, but did not see either Hart or Mrs. T. Thus, while the blindness of the victim here prevents the identity of the assailant from being established with absolute certitude, we are unable to conclude that, as a matter of law, no rational trier of fact could find the evidence sufficient beyond a reasonable doubt. We hence find no such error as is claimed.

■ Appellants also contend that the evidence is insufficient to support a conviction for the robbery of Perla Palileo. The following evidence was adduced at trial. Frank White admittedly entered the room occupied by 77-year-old Andres Palileo and his wife, Perla. White demanded money. Mrs. Palileo gave White her purse, but it contained no money. She then said, "My money, my husband has the money." Perla then told her husband to get his wallet. Andres retrieved his wallet from a drawer and handed it to his wife; Perla gave it to White. White searched the wallet and removed the

---

[10]Appellant Varner also had a mustache, sideburns, and a beard at the time of the rape.

currency. Appellants' contention is that such evidence will support a conviction only of attempted robbery as against Perla Palileo.

We disagree. "When two or more persons are in joint possession of a single item of personal property, the person attempting to unlawfully take such property must deal with all such individuals. All must be placed in fear or forced to unwillingly give up possession. To the extent that any threat may provoke resistance, and thus increase the possibility of actual physical injury, a threat accompanied by a taking of property from two victims' possession is even more likely to provoke resistance. [¶] We view the central element of the crime of robbery as the force or fear applied to the individual victim in order to deprive him of his property. Accordingly, if force or fear is applied to two victims in joint possession of property, two convictions of robbery are proper." (*People* v. *Ramos* (1982) 30 Cal.3d 553, 589 [180 Cal.Rptr. 266, 639 P.2d 908], rev'd. on other grounds, 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].) No error appears.

Appellants also claim that expert medical testimony was inadmissible on the issue of great bodily injury, and that there was insufficient evidence to sustain the jury's finding on this issue as to the injuries inflicted upon victims Petersen, McDonald, Constance J. and Chow.

Evidence Code section 801, subdivision (a) allows expert witness opinion testimony "Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; . . ." Moreover, "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.)

This statute requires only that the expert be so *sufficiently* better informed than the juror that the opinion of the former would assist the deliberation of the latter. Medical doctors obviously have greater knowledge than lay jurors about the gravity of most injuries, particularly as they affect elderly persons. For this reason, medical experts have testified in the past regarding the substantiality of alleged great bodily injuries. (See, e.g., *People* v. *Sanchez* (1982) 131 Cal.App.3d 718 [182 Cal.Rptr. 671].) We therefore decline to find it reversible error to admit expert medical testimony concerning the significance of the subject.

As to the substantiality of the evidence supporting the finding: "In order to sustain a finding of great bodily injury 'there must be evidence of injury substantially *beyond* that necessarily present in the commission of [the crime].'" (*People* v. *Lopez* (1982) 131 Cal.App.3d 565, 573 [182 Cal.Rptr. 563].) Constance J. was in bed when Clay struck her; so, appar-

ently, was Claudia Chow; Fritz Petersen was 77 years old; Andrew Mc-Donald was 76 years old. Constance J.'s wound required seven stitches; McDonald received six stitches; Petersen needed five stitches; Claudia Chow required three stitches. Each finding of great bodily injury involved a head wound, inflicted with a pistol. In determining substantiality, the jury could consider the effect of severe blows upon elderly persons.

"A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description. Clearly it is the trier of fact that must in most situations make the determination. Here, while the issue might be close it appears that there were sufficient facts upon which the court could base its finding of great bodily injury and such a finding therefore will not be disturbed on appeal." (*People* v. *Jaramillo* (1979) 98 Cal.App.3d 830, 836 [159 Cal.Rptr. 771].) We therefore decline to disturb the jury's finding that placed the injuries in the instant case on the "substantial" side of that fine line.

 Appellants further allege that the prosecution failed to use due diligence in attempting to locate Paul Eriksen before trial, and argue from this that the admission of his testimony at the preliminary hearing on grounds of "unavailability" was improper. The People contend that due diligence was exercised in attempting to locate Eriksen, and that, under Evidence Code section 240, subdivision (a)(5),[11] he was indeed "unavailable."

 " 'Whether due diligence has been shown is a factual question to be determined according to the circumstances of each case. [Citation.] Unless there has been an abuse of discretion, the ruling of the trial judge will not be disturbed. . . .' " (*People* v. *Williams* (1973) 9 Cal.3d 24, 35 [106 Cal.Rptr. 622, 506 P.2d 998].) No abuse of discretion appears from this record.

At the hearing to determine whether Eriksen was "unavailable" under Evidence Code section 240, subdivision (a)(5), Inspector O'Connor, the officer delegated to serve the subpoena on Eriksen, recounted the following efforts to locate the missing witness: The inspector went to the Keys Rest Home six times and made several telephone calls to the home in search of Eriksen; O'Connor had the Keys Rest Home standing by to report any appearance by Eriksen to pick up his monthly check; O'Connor checked the San Francisco General Hospital, the Social Security agency, the Department

---

[11]Evidence Code section 240, subdivision (a)(5) provides: "(a) Except as otherwise provided in subdivision (b), 'unavailable as a witness' means that the declarant is: . . . [¶] (5) Absent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process."

of Social Services, and the missing persons bureau; Eriksen's social worker told the inspector that the witness had no relatives in the area and that any address change would not show up at Social Security for three months; O'Connor drove around the area frequented by Eriksen about eight times.

Having heard evidence and argument in this matter, the trial court concluded that Eriksen was indeed "unavailable." That determination of a factual question, supported as it is by substantial evidence, will not be disturbed on appeal.

 Appellants also ask us to find error in the trial court's failure to poll the jury as to the effect upon them of the unsolicited remarks of a witness.[12]

During cross-examination, 77-year-old Fritz Petersen remarked to a defense attorney, "Hey, no offense to you. Diane Feinstein[13] wants you to give them a long, long time." Counsel for appellant Varner asked that the comment be stricken and the jury cautioned to disregard it. The trial court characterized the remark as "nonresponsive" and instructed the jury, "There was no question pending. The last remark is stricken. You are not to consider it."

Considering that the trial judge had not heard Petersen's words and so informed defense counsel, that a number of jurors indicated to the court that they too had not heard the remark, and that such an inquiry would likely have increased jury awareness and unduly emphasized the remark's significance, we find the court's admonition to be sufficient.

## IV

 Appellants next claim that CALJIC No. 2.22,[14] regarding the weight of the evidence, dilutes the "beyond a reasonable doubt" standard of proof required by the Fourteenth Amendment and thereby violated their due process rights.

---

[12]Appellants concede that this failure does not constitute reversible error, but ask us to consider it cumulatively in assessing whether appellants received a fair trial.

[13]The Mayor of San Francisco at the time of the crimes.

[14]The complained-of instruction provides: "You are not bound to decide in conformity with the testimony of a number of witnesses, which does not produce conviction in your mind, as against the testimony of a lesser number or other evidence, which appeals to your mind with more convincing force. This does not mean that you are at liberty to disregard the testimony of the greater number of witnesses merely from caprice or prejudice, or from a desire to favor one side as against the other. It does mean that you are not to decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. It means that the final test is not in the relative number of witnesses, but in the relative convincing force of the evidence."

We initially note that this instruction has received the imprimatur of our Supreme Court, which has declared that it "should henceforth be given in every criminal case in which conflicting testimony has been presented." (*People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 884-885 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845].) We also note that appellants' argument has been considered, and rejected, by other appellate courts of this state. (*People* v. *Flores* (1981) 115 Cal.App.3d 67 [171 Cal.Rptr. 365]; *People* v. *Salas* (1975) 51 Cal.App.3d 151 [123 Cal.Rptr. 903].)

In both of Clay's trials the court instructed the jury on the presumption of innocence, explained the state's burden to prove guilt beyond reasonable doubt, and defined "reasonable doubt" in accordance with Penal Code section 1096 (CALJIC No. 2.90). Apart from these instructions, the trial judge told jurors, "You are to consider all the instructions as a whole and are to regard each in light of all the others." Under similar circumstances, the court in *Salas* reasoned, "[I]t is apparent that the jury was instructed to weigh the relative convincing force of the evidence (CALJIC 2.22) only as part of the process of determining whether the prosecution had met its fundamental burden of proving appellant's guilt beyond a reasonable doubt as required by CALJIC No. 2.90." (*People* v. *Salas, supra,* 51 Cal.App.3d at p. 157.) Believing this reasoning to be persuasive, we hold that the giving of this instruction under these circumstances constituted neither state (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]) nor federal (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]) error.

██ Relying on *People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875] for the proposition that, where the jury is instructed on aiding and abetting, they should be charged that a conviction may be returned on such a theory only where they find that the defendant "with knowledge of the unlawful purpose of the perpetrator, . . . *intentionally* aids, promotes, encourages or instigates by act or advice the commission of such crime" (*id.,* at p. 916), appellant Clay also contends that giving the jury instruction on aiding and abetting as presently embodied in CALJIC No. 3.01[15] was error.

At his first trial, Clay was convicted of, among other offenses, sodomizing Paula H. and aiding and abetting Hart in the latter's subsequent rape of the victim. For reasons set forth below, the instruction as given on aiding and abetting was improper. The question remaining is whether the error is of

---

[15]CALJIC No. 3.01 provides: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages, or instigates by acts or advice the commission of such crime."

such a nature as to require reversal, or whether it may be considered harmless.

In a recent opinion, *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], our high court resolved the conflict in appellate opinions between those cases requiring *intent* to support a conviction upon aiding and abetting (*People* v. *Yarber, supra,* 90 Cal.App.3d 895; *People* v. *Petty* (1981) 127 Cal.App.3d 255 [179 Cal.Rptr. 413]) and those cases finding *knowledge* of the perpetrator's criminal purpose sufficient (e.g., *People* v. *Ott* (1978) 84 Cal.App.3d 118 [148 Cal.Rptr. 479]; *People* v. *Standifer* (1974) 38 Cal.App.3d 733 [113 Cal.Rptr. 653]). The Supreme Court found CALJIC No. 3.01 to be inadequate as not being properly reflective of California case law requiring that an aider and abettor intend to facilitate the commission of the target offense; and, finding it reasonably probable that under the circumstances there present the jury would have reached a result more favorable to the defendant had it been properly instructed, reversed the conviction pursuant to *People* v. *Watson, supra,* 46 Cal.2d 818.

In the case at bench, however, we are convinced that giving the erroneous instruction was, beyond any doubt, harmless error. The facts reveal that Clay, seizing Mrs. H. from behind, held a gun to her neck and propelled her down the hallway into a bedroom. There he ordered the victim to lie on her stomach and proceeded to forcibly sodomize her. Hart then entered the room and raped her while Clay was present in the doorway. The two men then bound her feet and hands and fled the residence. The only *conceivable* inference arising from these facts is that by his armed presence at the bedroom door Clay intended to assist Hart in his assault upon the victim. We therefore conclude that, even under the strict standard imposed by *Chapman* v. *California, supra,* 386 U.S. 18, the error here complained of is harmless.

V

█ Certain sentencing errors are raised. Appellants Hart, Varner and White were (as the People concede) improperly sentenced as the trial court included four month enhancements pursuant to Penal Code section 12022, subdivision (a) in computing the length of the subordinate term for consecutive offenses. Accordingly, the abstracts of judgment for Varner and White must be modified to delete the four-month enhancements imposed on counts 11, 15, 17, 19, 21, 22, 24 and 25. The abstract of judgment for Hart must be modified to delete the four-month enhancements imposed on counts 10, 15, 17, 19, 21, 22, 24 and 25.

■ Appellant Clay was found to have used a firearm in the robberies of Rudolfo Ochoa (count 10), Fritz Petersen (count 15), Andrew McDonald (count 17), Constance J. (count 19), and Paul Eriksen (count 24), and in the attempted robberies of Claudia Chow (count 21) and Mary Fchasun (count 25), as alleged pursuant to Penal Code section 12022.5. For each firearm-use enhancement Clay was sentenced to consecutive eight-month terms. Clay seeks to stay execution of all but one such enhancement on the ground that "the evidence only supports a finding that a 'single incident' or 'occasion' of gun use occurred"—per *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23].

We are convinced, however, the robberies here in question did not constitute a "single melee . . . one occasion, one intent, one objective, one indivisible transaction." (*Culbreth, supra,* at p. 335.) Here, with one exception, each of the victims occupied a separate room. The time, admittedly short, which it took to gain access to each successive room, not only negates the theory of a "single frenetic act of violence which, unfortunately, resulted in multiple victims" (*Culbreth, supra,* at p. 334), but, more importantly, also provided the opportunity for the special statutory objective of deterrence against firearm use to have its effect. Each time Clay entered another resident's room with a gun in his hand he created a new risk to a new victim. And each time he left a room, before entering the next, he theoretically renounced an opportunity to allow Penal Code section 12022.5 to persuade him to abandon a separate occasion of firearm use. "The legislative theory [of Penal Code section 12022.5] is deterrence, whose power augments with each successive occasion. If the threat of a minimum five-year extension has failed to deter the first occasion of gun use, a second occasion may be deterred by doubling the threat, a third by tripling it." (*In re Culbreth, supra,* at p. 334.)

It therefore appears that, with one exception, the imposition of consecutive enhancements per Penal Code section 12022.5 was proper. That exception concerns the enhancements imposed for the attempted robberies of Claudia Chow and Mary Fchasun. Chow and Fchasun occupied a single room and were accosted at the same time. Under our analysis as set forth above, the attempted robbery of these two individuals constituted but a single incident of gun use, for which but one enhanced punishment is allowed. Execution of sentence must therefore be stayed on one use enhancement and the judgment so modified.

■ Appellant Clay further asks that he be remanded for resentencing because the trial court failed to state its reasons for sentencing him to a consecutive aggravated term of nine years imprisonment for forcibly raping Paula H. while acting in concert with Hart.

Clay overlooks that portion of the record reciting the trial court's explanation that: "The reasons for the Court imposing the aggravated term in Counts III and IV are as follows: [¶] 1. The victims were particularly vulnerable; 2. The planning, sophistication or professionalism with which the crime was carried out indicates premeditation . . . [¶] the reason for the consecutive sentence for Counts IV and V are the defendant's prior convictions as an adult are numerous or adjudications of commission of crimes as a juvenile are numerous or of increasing seriousness; the defendant was on probation or parole when he committed the crime—each of the crimes."

We find no error in this claim.

■ As a final contention, appellant Clay asserts that the trial court used improper criteria in imposing consecutive sentences.

The trial court stated its reasons in this regard as follows: "[The crime] [1] Involves a separate victim and, in addition, [2] the crime involved great violence, great bodily injury, threat of great bodily injury or other acts disclosing a high degree of cruelty, viciousness or callousness, whether or not charged as an enhancement; [3] the defendant was armed with or used a weapon at the time of the commission of the crime, whether or not charged or chargeable as an enhancement; [4] the defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission; [5] he has engaged in a pattern of violent conduct which indicates a serious danger to society. [6] Additionally, the defendant's prior performance on probation or parole was unsatisfactory. [7] Additionally, the crimes involved separate acts of violence or threats of violence. [8] Additionally, the crimes were committed at different times or separate places rather than being committed so close in time or place to be considered a single period of aberrant behavior. [9] Additionally, the convictions for which sentences are to be imposed are numerous."

Clay complains that the first, second, third and eighth reasons were improper, generally because they involved a dual use of facts. Consequently, he seeks a remand for resentencing.

We have had occasion to address this issue previously. "The question to be answered in all these cases is whether on remand a result more favorable to the defendant is reasonably probable. [Citation.]" (*People* v. *Skenandore* (1982) 137 Cal.App.3d 922, 925 [187 Cal.Rptr. 368].) Even assuming the invalidity of the challenged reasons for consecutive sentencing, then, a greater number of valid reasons would remain. Considering that fact, the nature and number of assailants, the vulnerability of the victims, and Clay's

gratuitous violence and past record, we do not find it reasonably probable that the trial court would impose a more lenient sentence on remand.

The judgments must be modified in accordance with the views expressed above relative to sentencing errors, as so modified, the judgments in all other respects are affirmed.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied April 10, 1984.