Filed 3/28/24  P. v. Lerena CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B324924 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA078159) |
| v. | |
| PRECIOSA IRENE LERENA, | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of the County of Los Angeles, Robert G. Chu, Judge.  Affirmed, in part, and conditionally reversed and remanded with instructions.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne and Kim Aarons, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

A jury found defendant Preciosa Lerena guilty of second degree murder, among other crimes resulting from a carjacking and subsequent reckless driving spree.  On appeal, she raises challenges to the sufficiency of the evidence, her sentence, and the juvenile court's order transferring the case to the adult criminal court.  We affirm, in part, and conditionally reverse, as explained in detail below.

# II.    FACTUAL BACKGROUND

A.    *Prosecution's Case*

1.    Carjacking

On February 18, 2018, at approximately 2:20 p.m., Michael Dilworth, while parked in the lot of a Palmdale Walmart, saw defendant[1] attempt to take Patricia Levins's purse and then punch her multiple times in the face.  He then observed defendant enter Levins's white Toyota RAV4.  Dilworth tried to grab the car's door handle, but it was locked.  Defendant reversed the RAV4 into two other vehicles before she "took off" through the parking lot at over 20 miles per hour.  Dilworth observed Levins at the scene bleeding from a cut on her face.  The wind blew Levins's blood onto Dilworth's clothes and his car.

Following her encounter with defendant, Levins, who was 63 at the time, had a laceration on her forehead.  Levins's

---

[1]    At the time she committed the February 18, 2018, offenses, defendant was 17 years old.

2

daughter took her to the hospital where she received treatment for her injuries, including sutures for the laceration, a CT scan, and x-rays. Photographs taken after treatment showed bruising around her eyes, as well as on her forearm and wrist.

### 2. Pursuit and Collision

At approximately 2:34 p.m., a 911 dispatcher received a call[2] reporting a vehicle driving erratically westbound on Avenue S. The caller stated that a female in a white Toyota RAV4 was driving "in and out of lanes" and "ran several [traffic signals]."

Shortly after 3:00 p.m. that afternoon, Kenny Ramirez was driving his truck westbound on Lake Elizabeth Road (Lake Elizabeth) in Palmdale when he noticed two cars behind him in the rearview mirror. One of the vehicles, a white RAV4, "seemed to be driving very erratic[ally], and the other one was just trying to get out of the way." As Ramirez kept driving, he saw the RAV4 almost hit a pole at an intersection. When Ramirez attempted to make a left turn, the RAV4, which was still behind him, swerved around the left side of his truck into oncoming traffic and almost collided head on with another vehicle before swerving back in front of Ramirez and almost hitting him.

Ramirez called 911[3] while following the RAV4 westbound on Lake Elizabeth as it continued "[d]riving very erratic[ally]," swerving from the left curb to the right curb of the two-lane road.

---

[2]     An audio recording of the 911 call was played for the jury.

[3]     An audio recording of Ramirez's 911 call was played for the jury.

During his conversation with the dispatcher, Ramirez reported that "she's out of control"; "that girl is flying"; and "if she gets into an accident . . . this is gonna be a bad accident." He also reported that the driver was reaching speeds of between 80 and 100 miles per hour.

At some point, Ramirez saw the RAV4 pull over to the side of the road and park. He "parked right behind" it and exited his truck. As he approached the RAV4, he observed defendant alone inside and told her, "'You need to stop your vehicle. Turn it off.'" Defendant ignored Ramirez's admonition, instead gave him "a blank stare," and then started to reverse her vehicle.

Defendant executed a U-turn and sped off eastbound on Lake Elizabeth, back into town, at speeds of 75 to 90 miles per hour as Ramirez tried to follow behind for four to five minutes. As defendant neared town, she reached 100 miles per hour, after which Ramirez lost sight of her.

Los Angeles County Sheriff's Deputy George Hanley and his partner were patrolling in their marked black and white Sheriff's vehicle on the afternoon of February 18, 2018, when they received a call about a carjacking suspect. They activated their lights and siren and drove to the area where the suspect vehicle—a white Toyota RAV4—was last seen. Traveling north on Tierra Subida[4], the deputies turned left to westbound Lake Elizabeth and, shortly after completing their turn, they saw the

_____

[4]    Investigators determined that it was approximately four miles from the place where defendant executed the U-turn to the intersection at Lake Elizabeth and 10th Street West (10th Street). On the south side of the intersection with Lake Elizabeth, 10th Street becomes Tierra Subida Avenue (Tierra Subida). We therefore refer to that intersection as Lake Elizabeth and 10th Street/Tierra Subida.

RAV4 pass them going eastbound at approximately 95 to 100 miles per hour.[5]  Deputy Hanley estimated that the deputies were between one-half and three-quarters of a mile west of the intersection at 10th Street/Tierra Subida when defendant passed them going back towards that location.

In an effort to pursue and stop the RAV4, the deputies executed a U-turn so that they were driving eastbound on Lake Elizabeth directly behind another marked patrol vehicle with its lights and sirens also activated.  At that point, the RAV4 was about a quarter mile from the intersection at 10th Street/Tierra Subida.  The RAV4 continued eastbound and, as it approached the intersection at 10th Street/Tierra Subida,[6] there were vehicles stopped in front of it in the eastbound lanes waiting for the signal.  The RAV4 veered into the westbound traffic lanes, passed the vehicles stopped at the signal, and entered the intersection at 10th Street/Tierra Subida against a red light.

Matthew Newells was in his Ford Flex SUV, stopped in the left turn lane on northbound Tierra Subida.  His wife, Christine Jackson Newells, and their three children were passengers in the car.[7]  Tevye was in the front passenger seat, Taviere was in the

---

[5]     The speed limit on that portion of Lake Elizabeth was 55 miles per hour, and it reduced to 50 miles per hour just before the 10th Street/Tierra Subida intersection.

[6]     Deputy Hanley estimated that, from the time the deputies executed their U-turn, it took the RAV4 "seconds" to reach the intersection at 10th Street/Tierra Subida.

[7]     Because Matthew and his wife share the last name, we will refer to them by their first names.  Their three children were one-

right-rear passenger seat, Matthew, Jr., was in the middle-rear position in a car seat, and Christine was next to him in the left-rear passenger seat.

Matthew waited there for the left arrow to turn green so he could make the turn to westbound Lake Elizabeth. As he waited, Matthew heard sirens and saw three patrol cars coming up behind him on his left. One of the cars pulled in front of Matthew's SUV, and the deputy signaled for him to wait while the other two patrol cars entered the intersection and made the left turn to westbound Lake Elizabeth. The left arrow turned green while the deputy's car was still in front of Matthew. When the deputy made a U-turn and followed the other two patrol cars westbound on Lake Elizabeth, Matthew waited at the signal for a moment.

With the left arrow still green, Matthew pulled out into the intersection to make the left turn. At that moment, he saw a white car coming toward him "like a flash . . . ." It collided with the SUV.

Deputy Hanley and his partner saw the collision between the RAV4 and the SUV. Upon reaching the scene, they observed other deputies rendering aid to the people in the SUV, so they approached the RAV4. Deputy Hanley's partner "'told [defendant] to show her hands,'" and she replied, "''Fuck you.''" Deputy Hanley and his partner detained defendant at the scene.

When Deputy Mario Villalobos arrived at the scene of the collision, he was assigned to ride in an ambulance with defendant to the hospital. During the trip, he asked defendant for her name and date of birth. She gave him a false name and date of birth.

---

year-old Matthew Jr. N., 17-year old Tevye N., and 15-year old Taviere N.

6

### 3. Aftermath of the Collision

#### a. The Victims

Following the collision, Taviere and Matthew, Jr., were airlifted to the hospital and Tevye and Christine were transported there by ambulance. Matthew followed in a separate ambulance. He learned later at the hospital that Christine had died from her injuries.

At the time of trial, Taviere was still suffering from complications of the injuries that he sustained during the accident.[8] Among other issues, he had a plate and two screws in his back and surgeons needed to repair his aorta. Matthew suffered "a contusion, a right adrenal hemorrhage[,] and fractures." Tevye suffered a collapsed lung, and Matthew, Jr. suffered trauma to his chest and experienced bleeding in his brain.

#### b. Investigation

On February 18, 2018, Deputy Scott Shean, a Sheriff's traffic investigator, went to the scene of the collision at Lake Elizabeth and 10th Street/Tierra Subida. He arrived at approximately 3:15 p.m. and noted that all of the traffic signals at the intersection were functioning properly. Following his investigation, the deputy determined that "[t]he cause, the primary collision factor, [was] failing to stop at a red light with

---

[8] Taviere's medical records showed that he suffered "multiple significant trauma, including multiple fractures, injuries to the spleen, kidney, liver, and bladder, and dissection of the aorta."

an associated factor of unsafe speed given the present traffic conditions."

On the evening of February 19, 2018, Deputy Theodor Baljet, a Sheriff's homicide investigator assigned to investigate Christine's death, went with his partner to the hospital to interview defendant.[9] During the interview, defendant told investigators that, earlier in the day, she was drinking straight from the bottle and drank "a good amount."[10] Afterwards, her "homies" dropped her near the Walmart. She decided to take the RAV4 because it was "just right there," so she thought, "fuck it I'm just gonna take the car." According to defendant, Levins fought her for the RAV4's keys, so she hit her in the face.

Defendant, who did not have a driver's license but had taught herself to drive,[11] decided to drive the RAV4 to visit her "homies" and, because "there were no cars like that much in the way," she decided to "drive fast." She was "just driving all over," but then stopped; and that was when "the guy told [her] . . . like

---

[9]     The video recording of the interview with defendant was played for the jury.

[10]     Defendant's blood was drawn on the evening of the collision at 5:50 p.m. Chemical analysis showed no measurable blood alcohol content, but tests for cannabinoids and carboxy-THC were positive. A California Highway Patrol officer trained in drug recognition evaluated defendant at the hospital on the day of the collision at 8:15 p.m. and determined that defendant was not under the influence of drugs.

[11]     At the time defendant took the RAV4, she had not driven in three years.

8

stop the car." She instead made the U-turn because, "if [she was] gonna get busted, [she] might as well just waste the gas."

According to defendant, she saw the deputies who were trying to stop her, but because "there wasn't that much [traffic]", she decided "fuck it" and continued driving. She admitted that she should have stopped and that, before she collided with the SUV, the traffic signal was red. She also claimed that she did not "intentionally mean to crash into [the SUV]" and that she attempted to stop the RAV4 by putting her foot on the brake, but "it was not stopping." At the conclusion of the interview, defendant said, "'I fucked up. I fucked up bad because I injured people . . . .'"

Detective Aaron Percy, a Sheriff's traffic collision and accident reconstruction investigator, retrieved the event data recorders (EDRs) from the RAV4 and the SUV. The report generated from the RAV4's EDR showed that four seconds before the collision it was travelling 93 miles per hour and that, at the time of the collision, it was travelling at 83 miles per hour. The report also showed that, during that interval, "both . . . the gas pedal[] and the brake were being applied at the same time." The EDR from the SUV showed that five seconds before the collision it had been at a stop and that, at the time of the collision, it was traveling at 16 miles per hour.

Detective Rowell Quemuel conducted a vehicle inspection of the RAV4. According to the detective, "[e]verything appeared to be normal." There was no damage to the brake lines or anything else to indicate that the brake system was faulty.

9

B.    *Defense Case*

Defendant called one witness, a developmental psychologist, Elizabeth Cauffman. She was not a clinical psychologist, did not perform patient assessments, and did not evaluate defendant or review police reports or transcripts in this case. Therefore, she could not provide any insight as to defendant and could not address why she engaged in the conduct at issue in this case. Instead, she was a researcher who examined "how people develop and change over the life course."

According to Dr. Cauffman, adolescence begins "as young as age 10 and extends out until age 25." Around age 16 or 17, adolescents are "very similar" to adults in their "cognitive functioning." But there is "a gap between cognitively what [adolescents know at that age] and emotionally what [they] can control." Although their "cognitive system" is at an adult level, their "emotional system [is not] fully developed [until] into [their] late 20s." That difference in development is "why adolescents may know the right behaviors and the right things to do but still perform or do things in the more risky or irresponsible way." It explains "why you see risky behavior during adolescence." Specifically, they engage in such behaviors because the frontal lobe of the brain, which controls impulsivity and long-term thinking, is the last part of the brain to develop and it does not fully develop until "about 25 years of age."

Dr. Cauffman also examined the effect of substance abuse on emotional development in adolescents and determined that it slowed that development. Such abuse by adolescents caused "more impulsivity" and "decreased inhibitory control."

10

## III. PROCEDURAL BACKGROUND

In an amended information filed August 11, 2022,[12] the Los Angeles County District Attorney charged defendant in count 1 with second degree murder in violation of Penal Code section 187, subdivision (a);[13] in count 2 with vehicular manslaughter with gross negligence in violation of section 192, subdivision (c)(1); in count 4 with fleeing or eluding a pursuing police officer's vehicle causing death in violation of Vehicle Code section 2800.3, subdivision (b); in count 8 with carjacking in violation of section 215, subdivision (a); in counts 9 and 10 with hit and run causing property damage in violation of Vehicle Code section 20002, subdivision (a); and in count 13 with giving false information to a police officer in violation of Vehicle Code section 31.

The District Attorney further alleged as to count 4 that, in the commission of that crime, defendant inflicted great bodily injury on the five victims within the meaning of section 12022.7, subdivision (a) and as to count 8 that, in the commission of that crime, defendant inflicted great bodily injury of Levins, a person

---

[12]    On February 21, 2018, the prosecution filed in the juvenile court a 17-count petition against defendant alleging, among other offenses, murder and manslaughter. On February 22, 2018, the prosecution filed a motion to transfer jurisdiction over defendant to the adult criminal court. On November 13, 2019, the juvenile court commenced a hearing on the prosecution's motion to transfer defendant's case to the adult criminal court. On January 30, 2020, the juvenile court entered an order granting the transfer motion.

[13]    All further references are to the Penal Code unless otherwise indicated.

over 60 years of age, within the meaning of section 1203.09, subdivision (a) and inflicted great bodily injury on Levins within the meaning of section 12022.7, subdivision (a).

The jury found defendant guilty on all counts and found true the great bodily injury enhancement allegations, except the allegation as to count 8 under section 1203.09, subdivision (a), which it found not true.

On October 25, 2022, the trial court sentenced defendant on count 1 to a term of 15 years to life and on count 8 to a consecutive upper term sentence of nine years, plus three additional years under section 12022.7, subdivision (a), for an aggregate sentence of 27 years to life. The court also sentenced defendant on counts 9, 10, and 13 to three concurrent terms of 180 days in county jail. And, the court imposed on count 2 an upper term sentence of six years, plus an additional three years under section 12022.7, subdivision (a), but stayed that sentence under section 654; and imposed on count 4 an upper term sentence of seven years, plus an additional three years under section 12022.7, subdivision (a), but also stayed execution of that sentence under section 654.

## IV.  DISCUSSION

### A.  *Substantial Evidence Challenges*

Defendant challenges the sufficiency of the evidence in support of the jury's findings on:  (1) the great bodily injury allegation on count 8; (2) the "pursuing" peace officer element of count 4; (3) the intent to evade element of count 4; and (4) the

implied malice element of count 1.  We address each challenge below.

1.      Standard of Review

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt. [Citation.]  '"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence."' [Citation.]  [¶]  We review the sufficiency of the evidence supporting convictions and enhancements using the same standard, presuming "'every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.'" [Citation.]" (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)  "We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.)

2.      Evidence of Great Bodily Injury—Count 8

Defendant contends that the evidence of Levin's injuries was insufficient to establish that she suffered great bodily injury within the meaning of section 12022.7, subdivision (a).  According to defendant "the short, shallow laceration of less than one inch that required four stiches with some minor bruising did not constitute [great bodily injury]."

13

Section 12022.7, subdivision (a) imposes a three-year sentence enhancement for any person who intentionally and personally inflicts "great bodily injury" in the commission or attempted commission of a felony. Subdivision (f) defines great bodily injury as constituting "a significant or substantial physical injury." "[T]o be significant or substantial the injury need not be so grave as to cause the victim "'permanent," "prolonged," or "protracted'" bodily damage. [Citation.]" (*People v. Cross* (2008) 45 Cal.4th 58, 64.)

Here, the evidence showed that the then 63-year-old Levins was repeatedly punched by defendant in an effort to obtain the keys to the RAV4. That assault left Levins with a laceration on her forehead that required sutures, as well as bruising under her eyes, on her arms, and on her wrists. Her injuries were described by Dilworth—who not only saw blood on her face at the scene, but also had her blood on his clothes and his car—and Levins's daughter, who confirmed the severity of her mother's injuries as shown in photos taken at the hospital. Medical records and photographs taken at the hospital before and after she was examined and treated corroborated the nature and extent of her injuries. Viewed in a light most favorable to the jury's finding, that evidence supported a reasonable inference that Levins suffered significant and substantial physical injuries. (See, e.g., *People v. Clay* (1984) 153 Cal.App.3d 433, 459–460 [sufficient evidence of great bodily injury; victims suffered head wounds inflicted by a pistol, requiring three to seven stitches]; *People v. Saez* (2015) 237 Cal.App.4th 1177, 1189 [sufficient evidence of great bodily injury as "many of the victim's injuries were to her head"].) It was therefore sufficient to support the true finding on the great bodily injury allegation on count 8.

14

### 3.      Evidence of Initiation of Pursuit—Count 4

Defendant maintains that there was insufficient evidence that the deputies initiated a pursuit before the collision within the meaning Vehicle Code section 2800.3.  As she views the trial evidence, the prosecution failed to show that the deputies were ever behind defendant with their lights and sirens activated.

A violation of Vehicle Code section 2800.3 requires a showing of the elements of the offense of fleeing or eluding a pursuing police officer as set forth in Vehicle Code section 2800.1. (*People v. Jones* (2000) 82 Cal.App.4th 663, 667.)  In addition to showing willful flight from or an attempt to elude "a pursuing peace officer's motor vehicle" (Veh. Code, § 2800.1), that statute further "requires four distinct elements, each of which must be present:  (1) a red light, (2) a siren, (3) a distinctively marked vehicle, and (4) a peace officer in a distinctive uniform" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1008).  Proof of those additional elements is necessary "'to ascertain whether a person fleeing is on reasonable notice that pursuit is by a peace officer.'"  (*Ibid*.)

Contrary to defendant's assertion, there was sufficient evidence to show that defendant was on reasonable notice that she was being pursued by the deputies' police vehicles.  Deputy Hanley testified that he and his partner were in their marked patrol car, with its lights and sirens activated, when they saw defendant going in the opposite direction at 95 to 100 miles per hour.  They immediately executed a U-turn behind another marked police vehicle with its lights and sirens activated and the two cars began to follow defendant.  They were at that point about a quarter mile from the intersection with 10th

15

Street/Tierra Subida and in close enough proximity for Deputy Hanley to see defendant run the red light at the intersection, and collide with the SUV.

In addition, during her interview at the hospital with investigators, defendant admitted that she saw the deputies who were trying to stop her and that she nevertheless decided to continue driving. She also admitted that she should have stopped for the deputies and that she instead ran the red light at the intersection just prior to the collision. The jury's finding that defendant was fleeing a pursuing peace officer's vehicle prior to the collision was therefore supported by substantial evidence.

### 4. Evidence of Intent to Evade—Count 4

Defendant also argues that there was insufficient evidence on count 4 to show that: (1) she had the specific intent to flee from or elude the deputies and (2) her conduct in fleeing from or eluding deputies was the proximate cause of Christine's death. According to defendant, there was no evidence that her admittedly dangerous driving before the pursuit changed during the brief period of time that deputies were behind her and, similarly, no evidence that, in attempting to flee from or elude the deputies, she took any action inconsistent with her prior erratic conduct that caused Christine's death.

"The elements of the crime of flight from pursuing officer proximately causing death under Vehicle Code section 2800.3 are willful flight or attempt to elude a peace officer proximately causing death. More specifically, . . . to find a defendant guilty of that crime, the People [must] prove that a peace officer was pursuing the defendant and the defendant was driving a vehicle,

16

intended to evade the peace officer, while driving willfully fled from or tried to elude the pursuing officer, and in doing so caused the death of someone else." (*People v. Campbell* (2023) 98 Cal.App.5th 350, 387, fn. omitted.)

The evidence here showed that defendant began driving in an erratic and dangerous manner almost from the outset of the carjacking. But, as noted above, it also showed that once defendant made the U-turn to eastbound Lake Elizabeth and saw the deputies' vehicles with lights and sirens activated, she knew they were trying to stop her, but she refused to stop. Instead, she decided to continue driving at speeds in excess of 90 miles per hour. Then, as she approached the intersection with 10th Street/Tierra Subida with the deputies in pursuit, she encountered traffic directly ahead of her in the eastbound lanes waiting for the signal. Without slowing, she maneuvered into the westbound lanes, saw the red light signal, ignored it, and proceeded into the intersection at a high rate of speed. That conduct was sufficient to support a reasonable inference that, with the specific intent to evade the pursing deputies, defendant attempted to elude them by maneuvering into traffic lanes reserved for oncoming vehicles and then running a red light.

That same evidence also demonstrated that defendant's conduct in fleeing the pursuit, that is, entering opposing traffic lanes and running the red light at the intersection at a high rate of speed, caused Christine's death.

5. Evidence on Implied Malice—Count 1

Defendant argues that there was insufficient evidence to support the jury's finding on the second degree murder charge

17

(count 1), that she acted with the requisite implied malice. She claims that there is no evidence that she was subjectively aware her actions were dangerous to human life or that she acted with conscious disregard for human life, as opposed to acting with gross negligence.

"Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)

"'Implied malice is determined by examining the defendant's subjective mental state to see if [the defendant] appreciated the risk of [the defendant's] actions. [Citations.] Malice may be found even if the act results in a death that is accidental. [Citation.] It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence.' [Citation.]

". . . [The requirement of ] . . . conscious disregard for the danger to life distinguishes implied malice from gross negligence, which involves 'the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences.' [Citation.] 'Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, "I know my conduct is dangerous to others, but I don't care if someone is hurt or killed." The state of mind of the person who

18

acts with conscious indifference to the consequences is simply, "I don't care what happens."' [Citation.] The standard for implied malice is subjective and requires the defendant appreciate the risk involved." (*People v. Murphy* (2022) 80 Cal.App.5th 713, 726.)

The trial evidence here showed that defendant—who had no formal driver's training and knew on the day of the collision that she had not driven in three years—nevertheless decided that afternoon to take the RAV4 and "drive fast". Two eye witnesses independently reported her driving "erratically," "moving . . . all over the road," "in and out of lanes," and "out of control" at speeds between 80 and 100 miles per hour. Ramirez described her passing cars on the wrong side of the road and almost colliding with at least two other vehicles and a pole. He was so concerned about her driving, that he told the 911 operator, if she was involved in an accident, it was "gonna be a bad accident."

At some point, defendant pulled over to the side of the road and parked, long enough for Ramirez to approach her car and tell her to stop driving and turn off her engine. Instead of heeding Ramirez's admonition, defendant executed a U-turn and headed back toward town at over 90 miles an hour, in disregard for the risk to others. Before she reached the intersection with 10th Street/Tierra Subida, defendant passed deputies heading in the opposite direction and knew they were trying to stop her. She ignored their lights and sirens, thinking "fuck it", and continued toward the intersection at over 90 miles per hour, well in excess of the posted 50 miles per hour speed limit. Then, when she encountered traffic stopped in front of her as she neared the intersection, she did not slow down, choosing instead to veer into the opposing westbound traffic lanes. Finally, she admittedly

19

saw that the light controlling access to the intersection was red, but decided to ignore that signal and enter the intersection at an excessive speed, braking ineffectively and too late to avoid the collision. (See e.g. *People v. Moore* (2010) 187 Cal.App.4th 937, 940.)

That evidence supported a reasonable inference that defendant was aware her conduct endangered the lives of others and that she nevertheless proceeded to act in disregard for human life. The jury's finding of implied malice was therefore based on substantial evidence.

B.     *Great Bodily Injury Enhancement on Counts 2 and 4*

Defendant contends that the trial court erred by applying the great bodily injury enhancement under section 12022.7, subdivision (a) to her convictions on count 2 for vehicular manslaughter and count 4 for fleeing or eluding a pursuing peace officer in violation of section 2800.3. According to defendant, because great bodily injury is an element of the offenses charged in both counts, the enhancements were unauthorized under section 12022.7, subdivision (g)—which expressly prohibits application of the subdivision (a) enhancement to an underlying offense, if "[great bodily injury] is an element of the offense."

Even if we were to assume, without deciding, that the trial court erred by imposing the section 12022.7, subdivision (a) enhancements on the sentences for counts 2 and 4, we would nevertheless conclude that reversal is not warranted because any such error was rendered harmless by the court's orders staying enforcement of the sentences on those counts pursuant to section 654. The purpose of the section 12022.7, subdivision (g)

prohibition is to avoid double punishment for the same conduct, that is, causing great bodily injury in the commission of an offense. (See *People v. Cook* (2015) 60 Cal.4th 922, 930 [acknowledging that section 12022.7, subdivision (g) is intended to avoid "'dual punishment'"].) The section 654 stays on enforcement were based on similar grounds and therefore accomplished the same result. (See *People v. Liu* (1996) 46 Cal.App.4th 1119, 1135 ["The purpose of section 654 is to prevent multiple punishment for a single act or omission . . ."].) Therefore, because there are no challenges (or at least no meritorious challenges) to the other custodial components of defendant's sentence, she cannot demonstrate the prejudice required for reversal. (See *People v. Brockman* (1936) 15 Cal.App.2d 256, 258 ["If error arose in the decisions and judgments[,] it was rendered harmless by the act of the court in ordering the two sentences to be served concurrently"].)

C.     *Resentencing on Counts 2, 4, and 8—Senate Bill No. 567*

Defendant also contends that the matter should be remanded for resentencing in light of the "retroactive" amendments to section 1170, subdivision (b) implemented by Senate Bill No. 567 (2020–2021 Reg. Sess.; Stats. 2021, ch. 731, § 1.3). The Attorney General agrees that the Senate Bill No. 567 amendments to section 1170, subdivision (b) are "retroactive in [defendant's] case" but contends, among other things, that defendant forfeited her Senate Bill No. 567 challenges to her upper term sentences on counts 2, 4, and 8 by failing to raise those issues with the trial court.

21

We agree with the Attorney General that defendant forfeited her challenges to her upper term sentences under the amendments implemented by Senate Bill No. 567. Those amendments to section 1170 became effective January 1, 2022, and defendant was not sentenced until October 25, 2022. Defendant therefore was obligated to raise her objection in the trial court in order to preserve her argument on appeal. (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1113.)

Defendant contends, in the alternative, that if her trial counsel failed to preserve her Senate Bill No. 567 sentencing issues, she received ineffective assistance of counsel. But, other than citing *Strickland v. Washington* (1984) 466 U.S. 668, she does not adequately develop her argument or articulate how she was prejudiced by her trial counsel's inaction. (See *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 418–419; *People v. Ham* (1970) 7 Cal.App.3d 768, 783, disapproved on other grounds in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3.) We therefore do not address her argument further.

D.     *Reversal for New Transfer Hearing—Assembly Bill No. 2361*

Defendant's final contention is that she is entitled to a conditional reversal and remand of the matter for a new transfer hearing pursuant to Assembly Bill No. 2361's amendments to Welfare and Institutions Code section 707 (section 707) which became effective after defendant's transfer hearing and conviction and sentencing in this case. The Attorney General agrees that Assembly Bill No. 2361 applies to this case and that

it requires conditional reversal and remand for a new transfer hearing.

"Effective January 1, 2023, the Legislature amended section 707, adding the following language: 'In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' (§ 707, subd.(a)(3), as amended by Stats. 2022, ch. 330, § 1.)  This changed the finding a juvenile court must make before ordering a transfer in two ways: (1) raising the standard of proof and (2) requiring a new specific finding regarding amenability to rehabilitation." (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284.)

We agree that Assembly Bill No. 2361 applies to defendant's case, that she is entitled to its ameliorative benefits, and that conditional reversal and remand thus are warranted for the limited purpose of conducting a new transfer hearing under the requirements of that enactment.  We will therefore conditionally reverse the judgment of conviction and remand the matter to the trial court with instructions.

## V.    DISPOSITION

The judgment of conviction is conditionally reversed and remanded to the juvenile court for a new hearing under section 707, as amended, to determine whether that court would have transferred the case to the criminal court under the current law. If the juvenile court determines that it would not have transferred the case under the current law, it shall treat defendant's convictions as juvenile adjudications and order an appropriate disposition in light of this opinion.  If the juvenile court determines that it would have transferred the case to the criminal court under current law, the judgment of conviction shall be reinstated.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

BAKER, Acting P. J.                    LEE, J.*

---

\*      Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.